**KOPPERS COMPANY, Inc., Plaintiff,**

v.

**FOSTER GRANT CO., Inc., Defendant.**

Civ. A. No. 64-24-C.

United States District Court
D. Massachusetts.

June 2, 1967.

Malvin R. Mandelbaum, and James H. Callahan, of Kenyon & Kenyon, New York City, Harold M. Willcox, Boston, Mass., for defendant.

Donald R. Grant, Ropes & Gray, Boston, Mass., Wayne L. Benedict and William L. Mathis, of Burns, Doane, Benedict, Swecker & Mathis, Washington, D. C., for plaintiff.

## OPINION

CAFFREY, District Judge.

This is a civil action for alleged infringement by defendant of two patents owned by plaintiff, United States Patent No. 2,673,194 (hereafter '194) and United States Patent No. 2,687,408 (hereafter '408). Both patents refer to a chemical reaction or process known in the trade as bead polymerization. Defendant is accused of infringing both patents in the course of its commercial production of a substance called Polystyrene. Plaintiff Koppers Company, Inc. is a Delaware corporation with a principal place of business in Pittsburgh, Pennsylvania. Defendant Foster Grant Co., Inc. is a Delaware corporation with a principal place of business in Leominster, Massachusetts.

The '194 patent is entitled "Suspension Polymerization," and was issued to plaintiff, assignee of J. M. Grim, on March 23, 1954, on the basis of an application filed on November 9, 1951. It relates to the suspension (bead, pearl, or granular) polymerization of ethylenic monomers such as styrene. The monomer droplets are suspended in water by tricalcium phosphate powder. Benzoyl peroxide is employed as a catalyst. The suspension and polymerization are aided by stirring and by the application of heat. This patent states that the patent inven-

tion consists of using tricalcium phosphate having a particle size which is predominantly in the order of submicron. The patent describes submicron as meaning a "particle between 0.2 and 0.005 microns in diameter." The patent also recites that in some cases its invention consists in further modifying the effectiveness of the phosphate with an "extender," i. e., with the use of an anionic surface-active agent (hereafter surfactant).

The '194 patent is a continuation in part of an earlier application and it is entitled to an effective filing date of November 18, 1947. Prior to trial plaintiff charged that claims 1 through 5 of the patent were being infringed and in his opening counsel for plaintiff made the additional charge that claim 24 of the patent was being infringed. Claims 2 through 5 are "dependent" on claim 1. They serve to limit and specify the monomer and the phosphate. Claims 1 and 24 read as follows:

"1. In a process for preparing polymer beads comprising the step of polymerizing in a stable, aqueous suspension a polymerizable composition comprising at least one polymerizable ethylenic monomer, said suspension being stabilized during the polymerization by means of a finely divided phosphate, difficultly soluble in water, and containing for each phosphate group at least three equivalents of a metal, the carbonate of which is only slightly soluble in water, the improvement of extending said phosphate by an anionic surface-active agent in an amount between about 0.0005% and 0.05% by weight of the total suspension."

"24. In a process for preparing polymer beads, the steps of forming a stable aqueous suspension of styrene, by means of from about 0.1% to about 0.5% by weight of the total suspension of finely divided hydroxy apatite, said hydroxy apatite having a particle size which is predominantly in the order of a submicron and said hydroxy apatite being extended by an

anionic surface-active agent and effecting polymerization of the polymerizable composition while thus dispersed in the presence of no more than about 0.3 part of benzoyl peroxide per 100 parts of styrene, and the amount of anionic surface-active agent is between about 0.0005% and about 0.05% by weight of the total suspension."

The claimed infringement of claims 1 through 5 of the '194 patent is the use of an anionic surfactant in an amount between 0.0005% and 0.05% by weight of the total suspension as an "extender" of the "finely divided phosphate." Claim 24 calls for the use of the same type and amount of extender. It describes the suspending agent as "finely divided hydroxy apatite," said hydroxy apatite having a particle size which is predominantly in the order of a submicron.

The '408 patent, entitled "Aqueous Polymerization," with a phosphate suspending agent and buffer, was issued to plaintiff on August 24, 1954, on the basis of an application filed by Grim on October 3, 1951. The '408 patent relates to the same type of process as the '194 patent but adds as the allegedly inventive factor the maintenance of a pH of between "6 and 9," during the polymerization process by adding the oxides and hydroxides of calcium, magnesium, barium or zinc. "pH" is a designation of hydrogen ion concentration and is a logarithmic function, i. e., pH 8 means a hydrogen ion concentration ten times that of pH 9. The chemical reaction is influenced by the actual hydrogen ion concentration of the solution and not by the pH designation. Claim 1 of the '408 patent states:

"In a process for preparing polymer beads comprising polymerizing a polymerizable composition comprising at least one ethylenic monomer while said polymerizable composition is suspended in water, said water suspension being stabilized during the polymerization by means of a finely divided phosphate difficultly soluble in water and containing at least three equivalents of a metal the carbonate of which is

only slightly soluble in water said polymerization being catalyzed by a peroxide catalyst, the improvement comprising maintaining the pH of said suspension between approximately 6 and 9 by the addition of a buffer chosen from the class consisting of the oxides and hydroxides of a metal chosen from the class consisting of magnesium, calcium, barium, and zinc, in which suspension the ratio in parts by weight of said polymerizable composition to water is no more than 3.1."

Styrene (a monomer) is an oily liquid that is not soluble or miscible in water. When it is subjected to the action of a catalyst it may be caused to polymerize and thus form polystyrene, a widely useful solid plastic. Three types of polymerization may be employed, (1) mass or bulk polymerization, (2) emulsion polymerization, and (3) bead, pearl, or suspension polymerization. In the bead polymerization process (the type primarily involved herein), the monomer is agitated in water in the presence of a dispersing agent so as to break up the monomer into small droplets. The polymerization is allowed to proceed within these droplets with each droplet being considered a separate mass polymerization system and with the surrounding water being considered a particularly convenient heat control means. The known dispersing agents are in two distinct categories, water-soluble hydrophilic colloid materials and finely divided inorganic solids, more or less powdery in their consistency. Prior to the Grim patent the bead polymerization process had not been used on a commercial scale for the production of polystyrene for molding and extrusion.

The evidence taken at the trial was primarily limited to that bearing on the question of whether plaintiff's patents are valid or whether they are invalid as lacking invention over the prior art. 35 U.S.C.A. § 103 provides that patents are invalid and unenforceable if the differences between the patent and the prior art "are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art." In Graham v. John Deere Co., 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966), the Supreme Court recently directed (at p. 17, 86 S.Ct. at p. 694) that:

"The scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined."

■■ I am persuaded that both patents are invalid for lack of invention over the prior art. This ruling is based upon an examination of the prior art, particularly as contained in defendant's Exhibit 21, a comparison therewith of the claims of the two patents in suit, and the testimony of defendant's expert, Dr. John M. DeBell.

Dr. DeBell, a well-qualified chemical expert whose background and experience are set out in full in the transcript, testified for more than two days, explaining in considerable detail various prior patents and publications found in the prior art. He explained the meaning of many chemical terms and their significance in relation to bead polymerization of ethylenic monomers, including styrene. On the basis of his lengthy background in the field of chemistry and chemical engineering, including his employment and supervision of chemists, he testified as to the level of ordinary skill in the chemical field, and he testified with regard to approximately twenty publications included in the prior art. He was cross-examined as to approximately ten of these publications and expressed the opinion, which I accept, that a chemist of ordinary skill could take any two or three of them and by a process of experimentation be inevitably led to Grim's alleged invention. Dr. DeBell testified without contradiction that he would expect a chemist of ordinary skill to be able to utilize the prior art disclosures as a guide in adjusting the

amount of suspending agent, anionic surfactant, and test conditions to produce the desired results.

The portions of the prior art as to which Dr. DeBell was cross-examined establish the following: bead polymerization of ethylenic monomers was fully described in the late 1930's. An article by Houwink published in 1939 described it as follows:

"It was first observed with the acrylic esters that on vigorous stirring of a mixture of acrylic ester and water, without addition of emulsifier, but under polymerization conditions—i. e., with warming and in the presence of catalysts—the droplets of acrylic ester suspended in water are polymerized to more or less coarse beads. This method was improved with the discovery of substances which favor the formation of fine droplets in water and completely prevent them from sticking together, so that the polymer is obtained from such a mixture in the form of uniform, small beads." (DX–21, Tab 14T, at 20–21.)

Houwink then discussed what substances should be used to prevent the droplets from sticking together:

"As such substances there are used water-soluble organic colloids, e. g., gelatins, pectin, water-soluble starch, synthetic high molecular weight compounds such as salts of polyacrylic and polymethacrylic acids, polymethacrylamide, and polyvinyl alcohol. Remarkably, finely divided solid substances slurried or suspended in water also possess the same activity, e. g., kaolin, talcum, a precipitate of magnesium carbonate, aluminum hydroxide, etc. After the end of the polymerization, these substances are removed by slurrying or dissolving them." (DX–21, Tab 14T at 21.)

Grim discussed the same subject in his August 1, 1946 report (DX–22, page 14).

Dr. DeBell characterized the Crawford et al. and the Rohm et al. patents (DX–21, Tabs 2, 4) as the cornerstones of the suspension polymerization art with water-soluble organic colloids and finely divided solid agents respectively. These patents emphasize the importance of adjusting the amount of suspending agent used, the rate and manner of stirring, and other factors to be considered in avoiding emulsions and in obtaining the desired bead size. The Crawford patent pointed out that since suspending agents do not all have equal dispersing powers, experimentation is needed when changing from one to another, even of the same type. (DX–21, Tab 2, page 2.) The Crawford and Rohm patents were for bead polymerization of ethylenic monomers and the Rohm patent specifically includes styrene among the suitable monomers. (DX–21, Tab 4, page 1.)

Hiltner patent 2,264,376 (DX–21, Tab 5) described a method of polymerizing ethylenic monomers including styrene in order to obtain better plasticity. In Hiltner's Example 1 he used a soluble colloid suspending agent, benzoyl peroxide as the catalyst, and used as the anionic surfactant sodium lauryl sulfate in the amount of 0.016% of the total suspension. This amount of anionic surfactant is within the range claimed by Grim in his '194 patent. Dr. DeBell testified that when he compared claim 1 of Grim '194 with Example 1 of Hiltner, he found that Hiltner showed everything in the Grim example except that Hiltner used a colloidal type suspending agent instead of a finely divided phosphate.

Dr. DeBell testified that Collins patent 2,388,601 also showed the use of anionic surfactants in conjunction with soluble colloidal dispersing agents. He discussed the effects of surfactants on surface tension in the system toward the end of maintaining stabilization of suspension. His examples illustrated the effect that varying the concentration of dispersing agent and changing the stirring speed had on particle size.

Dr. DeBell explained at some length the Sturrock application resulting in patent 2,555,298 relating to the polymerization of dimethylstyrene compounds, including calcium phosphate. He testified

346

that calcium phosphate as used in Sturrock really means tricalcium phosphate, and that the use of the term "calcium phosphate" as meaning tricalcium phosphate $(Ca_3(PO_4)_2)$ is also followed by plaintiff. In fact, the witness Teach, who was associated with Grim, testified that calcium phosphate is $Ca_3\ PO_4$ taken twice, i. e., tricalcium phosphate.

Dr. DeBell pointed out that both Sturrock and Hohenstein disclosed that calcium phosphate could be used in the polymerization of dimethylstyrene as one of the solid suspending agents. In his 2,-524,627 patent, Hohenstein specifically described and claimed finely divided tricalcium phosphate as a dispersing or suspending agent in the polymerization of ethylenic monomers including styrene.

In 1946 a group of chemical experts, including Dr. DeBell, was appointed by the Quartermaster General for the purpose of going to Germany to determine what progress had been made by the German chemical industry in the field of chemistry immediately prior to and during World War II, which information had not been available in this country during that period because of the hostilities. Following this trip, DeBell wrote an article entitled "German Plastics Practice" (DX-21, Tab 19) which added to the prior art information he learned from the German scientists about suspension polymerization of the ethylenic monomer methyl methacrylate in the presence of an insoluble inorganic suspending agent together with a surfactant.

While an analysis of the testimony and of the prior art, tending to show lack of invention, could be proliferated almost indefinitely were this opinion to set out in full all the relevant provisions of the prior art put in evidence at the trial, it suffices for present purposes to add only one additional finding re the prior art, and that is that long before Grim's '408 patent the trade literature had made clear to the industry the effect of pH on polymerization and the need to control it by the use of a buffer or adjuster, i. e., Hohenstein's article in "India Rubber World," DeBell's "German Plastics Practice," Hohenstein '627 patent, Hohenstein's Belgian patent of May 2, 1950, and Hohenstein's article in the "Journal of Polymer Science" (DX-21, Tab 17).

I find and rule that both the Grim '194 patent and the Grim '408 patents are invalid for lack of invention over the prior art. For this reason I do not reach the issues of indefiniteness, overclaiming, or infringement.

Complaint dismissed.